WALLING et al. v. PORTER GILDERSLEEVE CO.

PORTER GILDERSLEEVE CO. v. WALLING et al.

(District Court, S. E. D. Pennsylvania. May 4, 1915.)

Nos. 83, 85.

SHIPPING ☞54—CHARTER—SINKING OF BARGE—LIABILITY OF HIRER.

The sinking of the bow section of a hinge barge, while lying at a pier, *held*, under the evidence, to have been due to unseaworthiness, for which the owner could not recover from the hirer; but the subsequent sinking of the stern section, which was tied up at a bulkhead, during the falling tide, *held* due to the negligence of the hirer, who had full charge, in not mooring her properly and with sufficient line.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. ☞54.]

In Admiralty. Suit by Elmer E. Walling and Helen M. Oliver, owners of the barge R. S. Oliver, against the Porter Gildersleeve Company, with cross-libel. Decree for libelants for part damages.

George P. Rich, of Philadelphia, Pa., for owners.

Howard M. Long, of Philadelphia, Pa., for hirers.

DICKINSON, District Judge. The differences between the parties to this litigation are the outcome of relations which began with the request of the Porter Gildersleeve Company to Walling et al. for the hire of a barge. The Gildersleeve Company were hauling oyster shells. The barge had previously been used for the lightering of coal in the harbor. Owing to labor troubles existing at the time, the owners of the barge were unable to supply a master for the boat. The Gildersleeve Company thereupon suggested that they had a man of experience whom they could put in charge of the boat. The man thus put aboard was to be paid by the owners, through an arrangement by which the hirers were to pay him $55 per month and deduct this from the hire of the boat. The bargain was made orally over the telephone. It was confirmed, however, by letters from the owners, recapitulating the points of the agreement reached, which were that the hiring was for two weeks or longer at $5 per day; the Gildersleeve Company was to put a man on board the boat, see that she was given proper attention, and returned to the owners in good condition, with an added stipulation as to the payment of the man in charge of the boat.

The boat involved is the R. S. Oliver. She is a hinge boat; the two sections being known as the bow and stern, or forward and aft, sections. The agreement referred to was made October 9, 1913. The confirming letters followed on the same date and on the following day. On October 24th the owners wrote, requesting the return of the boat on October 27th following. The letter does not appear to have reached the Gildersleeve Company, but they received a similar request by telephone. They were not then ready to return the boat, and with the owners' acquiescence kept her, without any definite re-

turn date being fixed. On October 28, 1913, the bow section sank at the Vine Street wharf. The stern section sank in Rancocas creek on November 5th. The owners claim for the consequent damage to the boat. The proctors of the respective parties are in substantial accord upon the obligations which rest upon owners and hirers. The principles of law upon which these rest are that a warranty of seaworthiness and fitness for the general purposes of the intended use, when known, as was the case here, is implied on the part of the owner, and that the owner incurs the risk of loss of or injury to the boat incident to its use, and not due to the negligence of the hirer, when in his use or under his management and control, and that the hirer is answerable for damages to the boat resulting from his negligence.

The controversy between the parties here is over the facts from which the causes of the mishaps to the two sections of the boat appear. The owners attribute the sinking of the boat to the negligence of the hirers, and the hirers ascribe the cause to the unseaworthiness and unfit condition of the boat. Fitness is a relative term, whose meaning is to be found in the special conditions to which it is applied. Results are not always the best tests of causes. Frequently, however, they do fairly give rise to presumptions. Like inferences may also spring from general conditions. If, for instance, a boat be moored in a safe harbor, free from dangers of the sea and risks of navigation, and is found shortly afterwards filled with water, without any other cause for her sinking appearing, the natural inference would be that she was in a leaking condition. A boat like her in other respects, recently in use and therefore presumptively seaworthy, if left in a position in which she would strand at low water and be left by the tide so badly listed as that she would fill before she was floated on the flood tide, and thus found sunk, under such circumstances a like natural inference would be that her sinking was due to want of care in mooring her in such a place. The mind of any one seeking the causes of these sinkings could not rest easily under any other conclusions than those suggested above, unless there was something in the circumstances as disclosed by the histories of what led up to the results to give other adequate explanations of the disaster.

These general observations are specially applicable to the controversy between these parties. The bow section of this boat sank at the Vine Street wharf. She had been taken there for the purpose of being loaded with oyster shells. The place at which she was being loaded is protected on every side, except from the southeast. No expectation of danger to the boat from any cause in such a place would arise except possibly from a severe southeaster. Even a southeast storm which suggested danger would be an unusually severe one. There is absolutely nothing in the evidence to account for the sinking of the boat, other than her leaky condition. The only other cause for her filling suggested is that ferryboats left and arrived at a ferry slip on the south side of the place where the boat was made fast, and that she was there subjected to the swell from these ferryboats, involving a danger from which reasonable care and forethought would have protected her. When it is remembered that this boat was of a

size and used for lightering purposes in the harbor, it is clear that the fact that she filled cannot be ascribed to any such cause as that suggested. The captain of a barge of this size, who refused to take his boat up to or to leave her overnight at the Vine Street wharf (protected as the place is by piers extending out in the river on the south and north side), because of the danger of her being swamped by the swell from the ferryboat entering or departing from the adjacent slip, would be branding his boat as unseaworthy. There would be scarcely a day in which he could use her in the harbor in which he would not encounter a bigger swell than any ferryboat would make in such a place.

It is impossible to find any other cause for the bow section of the boat filling than that assigned by the evidence on behalf of the hirers, to the effect that this section of the boat was leaky and no adequate means were provided aboard of her for keeping her free. The finding, therefore, follows that this bow section sank from no cause ascribable to any negligence on the part of those at that time in charge of it.

The stern section was taken to a landing in Rancocas creek. This is, of course, a tidal stream. There was sufficient water to float the barge at high water. When the tide fell the boat was bound to ground, and at dead low water she was lying practically on the bare mud. The bed of this creek, as of streams of like character where there are bulkheads constructed at the sides of the stream, is cut by the action of the water into something approaching a V-shape, with the apex in the center of the bed of the stream and with the banks very steeply shelving from the bulkhead constructions on the sides. There is, of course, a bed of greater or less width in the middle of the stream. It is clear, therefore, that a boat, if moored alongside of the bulkhead, must have sufficient slack in her mooring lines to permit the boat to pay off from the wharf as the tide falls, and in this way reach a safe resting place when the tide is down and the boat grounds. A boat in such a place, if kept close moored to the bulkheads of the wharf, will, when she grounds, ground on the shelving bank, with the result that she will be on such a list that, if she be an open boat, the next flood tide will pour in over her gunwales and fill her before it will float her.

This general description of the to be expected will serve as an explanation of the filling of this stern section, and as no other explanation is in sight the conviction rests upon the mind that this was the cause of the boat sinking. The evidence supports this finding. This barge is an open boat for all practical purposes. She was decked over at what may be termed the bow, and at the stern sheets, and on each side of her. The idea of her construction in this respect may be best described by analogy to what are called washboards, which are at times put upon open boats of small size. This deck, however, was nothing like water-tight. The deck seams were open to an extent justifying the expression that she was as open on deck as a sieve. Except in this respect there is no evidence of such a leaky condition of this stern section as to account for the sinking. The open condition of such decks as the boat had did not render her unsea-

worthy for the purposes for which she was hired and used. The decks were not there for the purpose of protecting the boat from seas, but were there to facilitate going about the boat and for loading and unloading. Her real protection from having her decks awash was in her freeboard. Any sea which would have reached her deck would be sufficient to have swamped her, had her decks been water-tight.

The cause to which the sinking of this stern section is above ascribed involves the finding that the swamping of this section was due to the negligence of the hirer, and not to the unseaworthy condition of this section of the boat. The general conclusions reached, therefore, are that the owners are entitled to recover from the hirers the damages resulting from the sinking of the stern section of the boat, but not of the bow section. The amount of the money loss to the owners ascribable to the damage to this after section of the barge is somewhat difficult of ascertainment, because the apportionment of the damage to each of the two sections of the boat was not in mind when the evidence of the damage was introduced. It can, however, be found with substantial accuracy.

There are two cases before the court—a libel by the owners, of the boat and a cross-libel by the hirers. Their legal merits have been discussed and disposed of as if they constituted one case. The hire of the boat has not been paid. The libelants are entitled to recover for the hire of the boat and for the damage to the stern section. The finding that the sinking of the bow section was not due to the negligence of the cross-libelants does not necessarily call for a further finding that they can recoup the loss of the cargo by a recovery from the owners. The boat had been in their charge for several weeks. They knew her condition. They risked the cargo which they put aboard of her and the incurring of the expenses to which they were subjected with their eyes open to the consequences. The loss which has befallen them they brought upon themselves. Indeed, they have had a narrow escape from a finding that in view of the condition of the boat, of which they had knowledge, they showed want of due care in loading her as deep and in the manner they did. The findings therefore are:

1. The sinking of the stern section of the boat R. S. Oliver was due to the negligence of the Porter Gildersleeve Company, and the libel to this extent is sustained.

2. Damages are awarded libelants in the sum of $247.

3. Libelants are awarded costs.

4. The cross-libel is dismissed.

Decrees embodying these findings may be submitted.